Honorable Mike Hewitt Senator, 16th District P.O. Box 40416 Olympia, WA 98504-0416
Honorable Janéa Holmquist Senator, 13th District P.O. Box 40413 Olympia, WA 98504-0413 —
Dear Senators Hewitt and Holmquist:
By letter previously acknowledged, you requested an opinion on a question relating to a bill proposed during the 2009 Legislature, Substitute Senate Bill 5446 (SSB 5446). We paraphrase your question as follows:
Does the federal National Labor Relations Act (NLRA) preempt provisionsof SSB 5446 proposing prohibitions on how an employer communicates withemployees regarding "labor and other mutual aid organizations?"
 BRIEF ANSWER
"Preemption" is the term that describes how federal law displaces state authority to legislate or allow civil litigation on a topic. Due to the supremacy of federal law under the Constitution of the United States, when a topic is addressed by federal law, it raises the question of whether state law is preempted and, if so, to what extent.
SSB 5446 would limit how an employer communicates with employees regarding "labor and other mutual aid organizations." The proposed state law would prohibit an employer from [original page 2] requiring employee attendance at meetings where the employer addresses matters directly related to unions, and would prohibit the employer from taking adverse employment actions against employees who refuse to attend required meetings or who complain that the employer may be violating this state law prohibition.
The NLRA also includes provisions that concern employer communications about labor unions. Section 7 of the NLRA protects an employee's right to organize or not to organize into a union. Section 8 of the NLRA protects from employer conduct or communication the employee's right to organize where such conduct or communication is an "unfair labor practice." Section 8(c) of the NLRA provides that employer speech regarding union organization shall not be considered an unfair labor practice, so long as it does not contain a promise of benefit or threat of reprisal with respect to union organizing.
SSB 5446 would be preempted for two independent reasons. First, the bill proposes a state prohibition and sanction for employer actions that arguably are already prohibited by the NLRA in some circumstances. Second, the provisions of SSB 5446 could be applied to limit the type of employer speech regarding union organization that Congress intended to be controlled by the free play of economic forces and reserved for market freedom.
 ANALYSIS
1. Background — SSB 5446[1]
Your question involves the provisions in SSB 5446 that would prohibit employers from requiring employees "to attend a meeting, or listen to, or respond to, or participate in, any communication relating to political orreligious matters as defined in" the bill. Substitute S.B. 5446, 61st Leg., Reg. Sess., § 3(1) (Wash. 2009) (emphasis added) (copy attached for ease of reference). The bill would define the term "political matters" to include, among other topics, "matters directly related to . . . labor or other mutual aid organizations." SSB 5446 § 2(4). Section 3(1) of SSB 5446 would therefore prohibit an employer from requiring an employee to meet, listen to, or participate in a communication about labor or other mutual aid organizations.
Section 3(2) would further restrict an employer's actions by providing that the employer may not take an adverse action against an employee who refuses to attend the meeting prohibited by section 3(1), who challenges the employer's action, or who is involved in a claim, suit, or investigation where an employee reasonably believes there has been a violation of the statute. The proposed language for section 3(2) reads:
 [original page 3] (2) An employer may not take or threaten to take an adverse employment action against an employee because the employee:
 (a) Refuses to attend a meeting or listen or otherwise respond to, or participate in, any other communication that the employee reasonably believes violates or would violate this section;
 (b) Challenges or opposes any practice or action that the employee reasonably believes violates or would violate this section; or
 (c) Makes a claim, files suit, testifies, assists, or participates in any manner in any investigation, proceeding, or hearing involving any practice or action that the employee reasonably believes violates or would violate this section.
SSB 5446 § 3(2).
SSB 5446 § 4 would authorize an employee to bring a civil action in superior court and claim a violation of Section 3(1) (the prohibition against requiring an employee to attend, listen to, or participate in a communication) or Section 3(2) (the prohibition on adverse employment actions). In such a civil action, a court could award injunctive relief, rehiring, back pay, restoration of benefits, and damages for losses incurred as a result of the employer's violation. SSB 5446 § 4.
The application of state laws to employer speech about union organizing has been the subject of substantial legal commentary. Some commentators explain the objective of proposed laws like SSB 5446 as efforts to eliminate an employer's use of "captive audience" meetings when there is a pending proposal for union organization. See, e.g., Paul M. Secunda,Toward The Viability Of State-Based Legislation To Address WorkplaceCaptive Audience Meetings in the United States, 29 Comp. Labor Law 
Pol'y J. 209, 209-11 (2008); Elizabeth J. Masson, "Captive Audience"Meetings In Union Organizing Campaigns: Free Speech Or Unfair Advantage?, 56 Hastings L.J. 169 (2004).
2. Background — Federal Preemption Of State Laws
In our federal system of government, the authority of the federal government is limited, but when Congress enacts a federal law pursuant to its constitutional authority, the federal law prevails over conflicting state laws. United States v. Gillock, 445 U.S. 360, 370, 100 S. Ct. 1185,63 L. Ed. 2d 454 (1980). This principle, known as the "preemption doctrine," lies at the heart of your question.
Article VI, clause 2 of the federal constitution includes the "Supremacy Clause" under which the federal "Constitution, and the Laws of the United States . . . shall be the supreme law of the land." As a result of the Supremacy Clause, when Congress legislates on a particular[original page 4] subject, "it is empowered to pre-empt state laws to the extent it is believed that such action is necessary to achieve its purposes." City of New York v. FCC, 486 U.S. 57, 63, 108 S. Ct. 1637,100 L. Ed. 2d 48 (1988). To resolve a preemption claim, the courts examine the specific federal and state laws at issue to determine whether Congress superseded the authority of states to act with regard to a particular subject. E.g., Altria Group, Inc. v. Good, 129 S. Ct. 538, 543
(2008).
3. Background — The National Labor Relations Act, 29 U.S.C. §§ 151-169
Congress enacted the National Labor Relations Act (NLRA),29 U.S.C. §§ 151-169, to "create a national, uniform body of labor law and policy, to protect the stability of the collective bargaining process, and to maintain peaceful industrial relations." United States v.Palumbo Bros., Inc., 145 F.3d 850, 861 (7th Cir.), cert. denied,525 U.S. 949 (1998). The NLRA provides an integrated scheme of rights, protections, and prohibitions governing employee, employer, and union conduct during organizing campaigns, representation elections, and collective bargaining. The NLRA also creates the National Labor Relations Board (Board) to interpret and administer the Act and to resolve labor disputes. See 29 U.S.C. §§ 153-154, 160; Garner v. Teamsters,Chauffeurs Helpers Local Union 776, 346 U.S. 485, 490, 74 S. Ct. 161,98 L. Ed. 228 (1953).
Specific provisions in the NLRA protect an employee's right to join or not join a union and provide mechanisms to resolve questions concerning union representation. See Boire v. Greyhound Corp., 376 U.S. 473,476-79, 84 S. Ct. 894, 11 L. Ed. 2d 849 (1964). Section 7 of the NLRA provides the core rights of employees "to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities" as well as the right "to refrain from any or all such activities[.]" 29 U.S.C. § 157. Section 8 defines and prohibits union or employer "unfair labor practices," which would include employer actions that infringe on an employee's Section 7 rights. 29 U.S.C. § 158. Section 10 authorizes the Board to adjudicate claims of unfair labor practices. See 29 U.S.C. § 160.
Parties have "frequently litigated" whether an employer's attempts to persuade employees not to join a union — or to join a particular union favored by the employer — amounted to a form of coercion or unfair labor practice prohibited by Section 8. See generally Chamber of Commerce v.Brown, 128 S. Ct. 2408, 2413 (2008) (describing history of litigation over employer communication to employees under the NLRA). When the NLRA was adopted in 1935, the first Board ruled that the ban on unfair labor practices in Section 8 demanded complete employer neutrality during union organizing campaigns; it concluded that partisan employer speech about unions would interfere with the Section 7 rights of employees. Id. In 1941, however, the Supreme Court rejected the Board's original approach. Nothing "in the NLRA prohibits an employer `from expressing its view on labor policies or problems' unless the employer's speech `in connection with other circumstances [amounts] to coercion within the[original page 5] meaning of the Act.'" Id. (quoting NLRB v. VirginiaElec. Power Co., 314 U.S. 469, 477, 62 S. Ct. 344, 86 L. Ed. 348
(1941)).[2]
In 1947, Congress adopted the Taft-Hartley Act amending the NLRA. The stated purpose of Taft-Hartley was to "insure both to employers and labor organizations full freedom to express their views to employees on labor matters." S. Rep. No. 105, at 23-24 (1947). The Taft-Hartley amendments added Section 8(c) to accomplish this purpose and clarify that partisan employer speech would not be considered an unfair labor practice:
 The expressing of any views, argument, or opinion, or the dissemination thereof . . . shall not constitute or be evidence of an unfair labor practice . . . if such expression contains no threat of reprisal or force or promise of benefit.
29 U.S.C. § 158(c). The NLRA, and court decisions construing it, thus speak of "coercion" in the context of employer speech that contains a threat of reprisal or promise of benefit relating to labor matters, not as to whether an employee is required to attend a meeting.
In short, the NLRA provides for a prohibition on unfair labor practices. As discussed next, SSB 5446 must be examined for how it affects the Board's jurisdiction to identify and address unfair labor practices. Further, SSB 5446 must be examined for interference with congressional policy judgments concerning employers engaging in speech concerning union organization.
4. Preemption Under The NLRA
As a result of the comprehensive federal laws, the courts have frequently found that the NLRA preempted state laws. "[I]n passing the NLRA Congress largely displaced state regulation of industrial relations." Wisconsin Dep't of Indus. v. Gould, Inc., 475 U.S. 282, 286,106 S. Ct. 1057, 89 L. Ed. 2d 223 (1986). To answer your question, we examine two lines of cases that define when state law is preempted by the NLRA. One line of cases is known as "Garmon preemption," and a second line of cases is known as "Machinists preemption," named after the cases in which the Supreme Court identified these forms of NLRA preemption. SanDiego Bldg. Trades Coun. v. Garmon, 359 U.S. 236, 79 S. Ct. 773,3 L. Ed. 2d 775 (1959); Machinists v. Wisconsin Employ. Relations Comm'n,427 U.S. 132, 96 S. Ct. 2548, 49 L. Ed. 2d 396 (1976).
[original page 6] As explained below, both types of preemption protect the NLRA from state laws that are inconsistent with the federal act, but each focuses on different federal concerns. Garmon preemption protectsthe Board's authority and discretion to apply a uniform system of lawsand remedies for conduct that is arguably prohibited or protected by the NLRA. Machinists preemption exists because the NLRA reflects acongressional policy that certain conduct and speech is to be leftunregulated and open to natural economic forces.
A. Garmon Preemption
States may not regulate "activity that the NLRA protects, prohibits, or arguably protects or prohibits." Gould, Inc., 475 U.S. at 286 (citing SanDiego Bldg. Trades Coun. v. Garmon, 359 U.S. 236, 244, 79 S. Ct. 773,3 L. Ed. 2d 775 (1959)). In Garmon, the Court explained that Congress intended to preempt state regulation that potentially impaired the jurisdiction of the Board as the federal forum for the resolution of labor disputes. State law cannot regulate the same employer or employee conduct that Congress empowered the Board to regulate under uniform national law. See Garmon, 359 U.S. at 242-44; see also Gould, Inc.,475 U.S. at 286. When the conduct to be regulated is "plainly within the central aim of federal regulation," then state regulation presents a "danger of conflict between power asserted by Congress and requirements imposed by state law" and "potential frustration of national purposes."Garmon, 359 U.S. at 244.
Garmon preemption, however, is broader than simply preempting matters plainly within the aim of the NLRA. Garmon preemption also applies even when it is unclear that the conduct to be regulated is subject to the Board's power under the NLRA. "When an activity is arguably subject to § 7 or § 8 of the [NLRA], the States as well as the federal courts must defer to the exclusive competence of the National Labor Relations Board if the danger of state interference with national policy is to be averted." Id. at 245. The preemption of state law that is "arguably" subject to the NLRA protects the Congressional policy that allows the Board to decide whether a subject is to be regulated under the NLRA.Id. at 245. The Board is charged with using its procedures and "its specialized knowledge and cumulative experience" to apply the NLRA and, in many circumstances, to define the scope of what is addressed by the NLRA. Id. at 242.
Thus, the first step in evaluating preemption under Garmon is to examine whether the employer conduct to be regulated by SSB 5446 is "arguably subject" to being addressed by the Board. We conclude that it is. A brief history of the NLRA shows that the Board has frequently addressed how employers may communicate during union organization and when an employer's conduct amounts to an unfair labor practice, including requiring employees to attend meetings for such purposes.
In its earliest case, the Board concluded that when an employer advises employees not to join a union, it interferes with and coerces the employees, because the employer has the power to fire. In re PennsylvaniaGreyhound Lines, Inc., 1 N.L.R.B. 1, 22-23 (1935). Subsequent cases such as Virginia Electric and Thomas allowed employer speech addressing union organization. Virginia Electric, 314 U.S. at 479-80 (remanding case to Board for further consideration of whether the employer's speech constituted an unfair labor practice); Thomas, 323 U.S. at 537-38.[original page 7] With regard to the employer conduct of speaking to an audience of employees who are required to attend, the Board originally concluded it was an unfair labor practice. In re Clark Brothers, 70 N.L.R.B. 802 (1946), enforced sub nom. Nat'l Labor Relations Bd. v.Clark Brothers, 163 F.2d 373 (2d Cir. 1947). After the Taft-Hartley amendments in 1947, the Board initially issued orders requiring an employer either to cease "captive audience" speech or to allow union representatives an equal opportunity to address the employees. In reBonwit Teller, Inc., 96 N.L.R.B. 608 (1951).[3] Subsequent Boards both rejected and refined how employers may require employees to listen to their position on unions. In re Livingston Shirt Corp., 107 N.L.R.B. 400, 409 (1953) (rejecting Bonwit Teller, Inc., and holding that "in the absence of . . . an unlawful broad no-solicitation rule . . . an employer does not commit an unfair labor practice if he makes a preelection speech on company time and premises to his employees and denies the union's request for an opportunity to reply"). More recent Board cases have ruled that "captive audience" speeches by an employer are lawful except during the last twenty-four hours before an employee election on a proposal to organize. In re Peerless Plywood Co., 107 N.L.R.B. 427 (1953). In addition to this "twenty-four hours before elections" rule, other Board decisions have found "captive audience" speeches by employers unlawful when combined with unlawful barriers to union solicitation. In reMontgomery Ward Co., 145 N.L.R.B. 846 (1964).
These Board cases illustrate that the Board has addressed conduct such as an employer requiring an employee to attend a meeting discussing a union or taking adverse employment actions against employees who refuse to attend such a meeting. In its cases, the Board has drawn and redrawn lines based on the timing of the employer action and other circumstances. We therefore conclude that conduct to be regulated by SSB 5446 is, at the least, "arguably subject to" the prohibition against an unfair labor practice in Section 8 of the NLRA. As a result, SSB 5446 meets the threshold test for Garmon preemption.[4]
We next turn to the recognized exceptions to Garmon preemption. Preemption is inappropriate if the Board has clearly determined that an activity is neither protected nor prohibited by the NLRA, and such Board precedent can be applied to "essentially undisputed facts." Garmon,359 U.S. at 246. In other words, this exception applies to matters that the Board has determined are clearly outside the scope of the federal act. One might argue that this exception applies here — the provisions of the NLRA do not explicitly grant an employer a protected right to require employees to listen to employer speech concerning labor organizing. SeeSecunda, 29 Comp. Labor Law Pol'y J. at 233-34 (arguing that Garmon
preemption is not applicable to a state law prohibition on "captive audience" speech by employers). However, such an argument would misapply this exception. Rather than concluding that such matters are outside the scope of the NLRA, the Board has delineated the lawful and unlawful use of this [original page 8] practice by employers; it has been and remains a topic where employer conduct may be brought to the Board and where the Board may refine or revisit its view of such employer conduct. Put another way, the Board has not clearly indicated the absence of NLRA authority or concern regarding when an employer may lawfully require employees to attend meetings or suffer consequences for refusing to attend and instead, on several occasions, has addressed the issue under the NLRA.
Another Garmon exception allows for application of the "traditional law of torts" or state laws that address "conduct marked by violence and imminent threats to the public order." Garmon, 359 U.S. at 247. This exception applies when state law addresses something "peripheral" to the federal interests in the NLRA and the state interest "weighs so heavily by comparison to the NLRB's interest in exercising exclusive jurisdiction that congressional interest to deprive the state of its power cannot be inferred." Hotel Employees Restaurant Employees v. Jensen,51 Wn. App. 676, 679-80, 754 P.2d 1277 (1988) (citing Garmon,359 U.S. at 243-44). The state interests advanced by proposed SSB 5446 would not meet this exception. The NLRA focuses on employer and employee communications regarding labor or mutual aid organizations and has delineated when employer communications constitute an unfair labor practice. We therefore conclude that the manner of employer communication is not a "peripheral" interest of the NLRA or the Board and, therefore, this exception would not apply to save SSB 5446.
B. Machinists Preemption
The Supreme Court described a second basis for preemption in International Association of Machinists v. Wisconsin Employment RelationsCommission, 427 U.S. 132, 96 S. Ct. 2548, 49 L. Ed. 2d 396 (1976), now known as Machinists preemption. Under Machinists, "the crucial inquiry [is] whether Congress intended that the conduct involved be unregulated" and whether the conduct is "to be controlled by the free play of economic forces." Id. at 140 (quoting NLRB v. Nash-Finch Co., 404 U.S. 138, 144,92 S. Ct. 373, 30 L. Ed. 2d 328 (1971)).
Machinists arose when an employer and union reached an impasse after a collective bargaining agreement expired. The Court recognized that both employers and unions have "economic weapons," and state law regulating the use of economic force by the union or employer could frustrate the processes built into the Act for resolving such disputes. Id. at 147-48. The employer obtained a state court order, pursuant to state law, requiring the employees not to use their "economic weapon" of refusing to work overtime. Id. at 148-49. The Court held that the state law affected the substantive aspects of bargaining between the union and employer, which Congress implicitly meant to be unregulated. Id. at 149. In reaching this conclusion, the Court held that by adopting the NLRA, Congress intended that certain employer and employee actions were not to be regulated by the States.
 Our decisions hold that Congress meant that these activities, whether of employer or employees, were not to be regulable by States any more than by the NLRB, for neither States nor the Board is afforded flexibility in picking and choosing which economic devices of labor and management shall be branded as unlawful. Rather, both are without authority to attempt to introduce some [original page 9] standard of properly balanced bargaining power to define what economic sanctions might be permitted negotiating parties in an ideal or balanced state of collective bargaining.
Id. at 149-50 (citations and internal quotation marks omitted). The Court therefore held that the state law that impaired the union's economic pressure interfered with the accomplishment of the full purposes of Congress. Id. at 151.
Under Machinists, the United States Supreme Court has repeatedly preempted state laws that affect the economic powers of employers and unions in connection with organizing or collective bargaining. In the recent Brown case, the Supreme Court applied Machinists to strike down a California law that barred employers who received state funding from using those funds to assist, promote, or deter union organizing; the law also sanctioned violators. See Brown, 128 S. Ct. at 2412. The Court concluded that the California statute attempted to regulate "within `a zone protected and reserved for market freedom.'" Brown, 128 S. Ct. at 2412
(quoting Bldg. Constr. Trades Coun. v. Associated Builders Contractors of Massachusetts/Rhode Island, Inc., 507 U.S. 218, 227,113 S. Ct. 1190, 122 L. Ed. 2d 565 (1993)). To conclude that there was a zone reserved for market freedom, Brown cited Section 8(c) of the NLRA,29 U.S.C. § 158(c). Section 8(c) provides:
 The expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under any of the provisions of this subchapter, if such expression contains no threat of reprisal or force or promise of benefit.
The Court recognized that Section 8(c) "manifested a `congressional intent to encourage free debate on issues dividing labor and management.'" Brown, 128 S. Ct. at 2413 (quoting Linn v. United PlantGuard Workers, Local 114, 383 U.S. 53, 62, 86 S. Ct. 657, 15 L. Ed. 2d 582
(1966)). Because Congress amended the NLRA to adopt Section 8(c), there was a congressional policy judgment to be protected from inconsistent state law:
 We have characterized this [congressional] policy judgment, which suffuses the NLRA as a whole, as "favoring uninhibited, robust, and wide-open debate in labor disputes," stressing that "freewheeling use of the written and spoken word . . . has been expressly fostered by Congress and approved by the NLRB."
Brown, 128 S. Ct. at 2414 (quoting Letter Carriers v. Austin, 418 U.S. 264,272-73, 94 S. Ct. 2770, 41 L. Ed. 2d 745 (1974)).
Like the California law in Brown, SSB 5446 does not directly prohibit or restrain employer speech. However, SSB 5446, Section 3 bars a "captive audience" meeting by an employer and Section 4 authorizes a broad civil action and sanctions against an employer who violates Section 3. The employer would be subject to significant liability if the employer fails to anticipate what is allowed or not allowed by SSB 5446. For example, under SSB 5446, Section [original page 10] 3(2), an employee may simply have a reasonable belief that the employer was violating the law and any adverse employment action against the employee could trigger liability for the employer. SSB 5446 thus makes an employer less able to participate in the "robust debate" contemplated by Congress and described in Brown. Like California's sanction for misuse of state grants, SSB 5446 would chill one side of what the NLRA envisions as a robust debate between labor and management. See Brown, 128 S. Ct. at 2416-17.
Our conclusion is supported by the Supreme Court's general observation that "Congress has been rather specific when it has come to outlaw particular economic weapons." Machinists, 427 U.S. at 143. We therefore conclude that provisions of SSB 5446 directed at employer meetings that address labor and mutual aid organizations would be state regulation in an area Congress intended to be open to economic forces. SSB 5446 would deny "one party to an economic contest a weapon that Congress meant him to have available." Machinists, 427 U.S. at 150. Therefore, it would be preempted.
We trust that the foregoing information will prove useful.[5]
Sincerely,
ROB MCKENNA Attorney General
JAY D. GECK Deputy Solicitor General
:pmd
:wrs
Enc.
[1] SSB 5446 was introduced during the 2009 legislative session and remains pending in the 2010 legislative session. See Senate Concurrent Resolution 8407 (2009) (a bill not enacted during one session of the 61st Legislature is retained pending future sessions of the same Legislature). We note also that the House of Representatives has a companion bill, HB 1528. Our analysis focuses on the language of SSB 5446.
[2] A few years later, the Court explained its 1941 ruling by expressly stating that an employer had First Amendment rights to speak during union organization campaigns:
[E]mployers' attempts to persuade to action with respect to joining or not joining unions are within the First Amendment's guaranty. . . . When to this persuasion other things are added which bring about coercion, or give it that character, the limit of the right has been passed. But short of that limit the employer's freedom cannot be impaired.
Thomas v. Collins, 323 U.S. 516, 537-38, 65 S. Ct. 315, 89 L. Ed. 430
(1945) (footnotes and citations omitted).
[3] The Second Circuit, however, refused to enforce the Board's order in this regard. Bonwit Teller, Inc. v. N.L.R.B., 197 F. 2d 640, 646 (2d Cir. 1952).
[4] Our conclusion is underscored by legal commentary regarding "captive audience" speech by employers. For example, the thrust of one law review article is that the Board should extend Peerless Plywood and ban "captive audience" speech by employers generally, not merely within twenty-four hours of an election. Masson, 56 Hastings L.J. at 185. In other words, the article illustrates how the Board arguably has authority to prohibit the employer conduct addressed by SSB 5446 but, to date, has not exercised its authority in that regard.
[5] The proposed bill would apply to both public and private sector employers. SSB 5446 § 1(3) (defining "employer" by reference to RCW49.12.005(3)(b), which includes private and public employers). The conclusions in this opinion are based on application of SSB 5446 to private "employers" and "employees" as those terms are defined in the NLRA. See 29 U.S.C. § 152(2), (3). The NLRA excludes domestic service, agricultural laborer, and employment by a parent or spouse from the definition of employees covered by the Act. Furthermore, the NLRA does not govern collective bargaining with state public employers. See29 U.S.C. § 152(2); see also Davenport v. Wash. Educ. Ass'n, 551 U.S. 177,127 S. Ct. 2372, 2376, 168 L. Ed. 2d 71 (2007) ("The National Labor Relations Act [NLRA] leaves States free to regulate their labor relationships with their public employees."). Because the NLRA does not apply to public employers, the above preemption analysis is not directly applicable.